In the

# United States Court of Appeals
## For the Seventh Circuit
_____

Nos. 06-3320 & 07-1590

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

and

PHILLIP S. STENGER, Receiver,

*Intervenor-Appellee,*

*v.*

CHARLES R. HOMA, et al.,

*Defendants,*

APPEALS OF:

PAUL JONES, DAVID POLLOCK
and CARIBBEAN VENTURES
INTERNATIONAL, INC.,

*Non-Party
Respondents-Appellants.*

_____

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 C 6895—**Ronald A. Guzman**, *Judge.*

_____

ARGUED SEPTEMBER 11, 2007—DECIDED JANUARY 24, 2008
_____

Before RIPPLE, MANION and WOOD, *Circuit Judges.*

RIPPLE, *Circuit Judge.* In the underlying litigation, the Securities and Exchange Commission ("SEC") sought, and was granted, an order freezing the assets of Charles Homa. In this appeal, Paul Jones and David Pollock, nonparties to the underlying action, appeal a judgment of contempt for failing to comply with that freeze order.[1] Caribbean

---

[1] We have appellate jurisdiction over this judgment. A nonparty need not await final judgment in the underlying litigation before appealing a civil contempt finding. *United States v. Dowell*, 257 F.3d 694, 698 (7th Cir. 2001). Monetary judgments against Mr. Jones and Mr. Pollock have been determined with the necessary particularity, even though the precise amount of prejudgment interest and attorneys' fees has not been determined. *See Shapo v. Engle*, 463 F.3d 641, 643 (7th Cir. 2006); *see also Herzog Contracting Corp. v. McGowen Corp.*, 976 F.2d 1062, 1064 (7th Cir. 1992) (holding that the court had jurisdiction where interest sum, although not calculated, required only a mechanical process to determine).

Here, Mr. Pollock and Mr. Jones are both nonparties. The district court found Mr. Pollock and Mr. Jones in contempt and ordered them, jointly and severally, to pay to the receiver $7,216,462.76 plus prejudgment interest. Mr. Pollock and Mr. Jones were not held jointly and severally liable with those defendants whose underlying action is not yet complete.

The prejudgment interest is sufficiently determined to permit this appeal. With regard to $5,000,000 of the judgment, the amount received by Mr. Jones and Mr. Pollock for the sale of Banc Caribe, the district court determined that interest began accruing on December 1, 2001. The interest on the remaining $2,216,462.76, the amount Mr. Pollock and Mr. Jones transferred from Mr. Homa's Sunset Fiancial/EAVH Holdings account at

(continued...)

Ventures International, Inc. ("CVI2"), another nonparty, appeals a default judgment imposed as a sanction for failure to comply with discovery requests and the consequent appointment of Phillip Stenger as receiver over its assets.[2] For the reasons set forth in this opinion, we affirm

---

[1] (...continued)
Banc Caribe, began to accrue on October 21, 1999, the date of the transfer. The court also noted that the receiver claimed $157,983.14 in attorneys' fees and costs, and it ordered the parties to follow the procedures set forth in the local rules for the collection of the claimed fees. The "district judge . . . finished with the case," and we have jurisdiction. *Chase Manhattan Mortgage Corp. v. Moore*, 446 F.3d 725, 726 (7th Cir. 2006).

[2] We also have appellate jurisdiction over CVI2's appeal; with respect to this entity, the district court's order was final under 28 U.S.C. § 1291. *See Matos v. Richard A. Nellis, Inc.*, 101 F.3d 1193, 1195 (7th Cir. 1996); *see also Philips Med. Sys. Int'l, B.V. v. Bruetman*, 982 F.2d 211, 214 (7th Cir. 1992).

On August 3, 2006, the district court found Mr. Pollock in contempt of court. It ordered him and Mr. Jones, jointly and severally, to disgorge in excess of $7.2 million in funds that they misappropriated in violation of the court's freeze orders. The court also enjoined them from dissipating any of their assets. Additionally, the district court issued a temporary restraining order against CVI2, an order appointing the receiver as temporary receiver for the corporation, and an order to show cause. The district court issued these orders to prevent Mr. Pollock from dissipating his assets he held in CVI2.

CVI2 then refused to comply with the district court's discovery orders. The district court considered CVI2's refusal to comply with the court's orders and noted that Mr. Pollock was the only person authorized to transfer ownership and control of

(continued...)

the judgment of the district court.

# I

## BACKGROUND

### A.

Between 1995 and 1999, Charles Homa operated an automobile title lending business called Cash 4 Titles ("C4T"). Sunset Financial Services, Ltd., was the marketing company for the various C4T entities. The C4T

---

2 (...continued)
the assets. The district court also noted that Mr. Pollock purposely had avoided the court's enforcement powers in the past. Finding that no sanction except default would cure CVI2's intentional failure to comply with the court's discovery orders, the district court declared CVI2 in default and took the receiver's allegations as confessed. The district court specifically took as admitted that Mr. Pollock was the only shareholder of CVI2. The district court then concluded by appointing the receiver of Mr. Homa's assets as the receiver of CVI2, and by ordering CVI2 to turn over its assets to the receiver to satisfy the judgment against Mr. Pollock.

We have jurisdiction to review the district court's discovery sanction that defaulted CVI2. *See Patterson ex rel. Patterson v. Coca-Cola Bottling Co. Cairo-Sikeston, Inc.*, 852 F.2d 280, 283 (7th Cir. 1988); *see also Philips*, 982 F.2d at 214. We also have jurisdiction to review the turnover of assets to the receiver. *See Matos*, 101 F.3d at 1195 (holding that, after *Peacock*, "a court's ancillary jurisdiction is greater in judgment-enforcement actions than in independent suits based on a judgment"); *see also Epperson v. Entm't Express, Inc.*, 242 F.3d 100, 104-06 (2d Cir. 2001); *Divane v. Krull Elec. Co.*, 194 F.3d 845 (7th Cir. 1999).

entities actually operated a huge Ponzi scheme: the loss by innocent investors exceeded $165,000,000.

On October 15, 1999, the SEC filed a civil enforcement suit (the "SEC Action") against Mr. Homa; the suit accused Mr. Homa of civil fraud in violation of United States securities laws.[3] At that time, the United States Department of Justice also brought criminal charges against Mr. Homa for securities laws violations.[4]

The SEC promptly sought freeze orders for all the C4T assets. The court granted the motions and issued two freeze orders. The first was entered on October 15, 1999. That order initially froze the assets of the defendants in the SEC Action.[5] A second freeze order, issued October 18, 1999, froze any bank account in which any of the defendants had signatory authority or beneficial interest, including C4T and Banc Caribe.

---

[3] On May 3, 2002, Mr. Homa consented to a civil judgment in the SEC Action in the amount of $157,993,830.25, plus $35,248,523.55 in prejudgment interest.

[4] Mr. Homa pleaded guilty to the charges on August 10, 2000, pursuant to a cooperation agreement.

[5] It stated, in relevant part, that defendants Sunset Financial Services and Charles Richard Homa, "and their officers, agents, servants, employees, attorneys and those persons in active concert or participation with Defendants, including but not limited to . . . Banc Caribe, Ltd., who receive actual notice of the order, by personal service or otherwise, are prohibited, directly or indirectly, in transferring, selling, assigning, encumbering, pledging, dissipating, concealing or otherwise disposing of in any manner, any funds, assets, or other property belonging to, or in the possession, custody or control of the Defendants, wherever located." Order, Oct. 15, 1999.

On November 2, 1999, Mr. Stenger was appointed receiver over the assets of Mr. Homa, Sunset Financial and other affiliated C4T entities, including the interests of any individuals or entities that constituted C4T property in Banc Caribe. The receiver's general mandate was to marshal receivership property for distribution to the injured investors.

**B.**

Mr. Pollock and Mr. Jones met and became friends in 1978. Mr. Pollock is a citizen of the United States who maintained a Florida driver's license until at least September 26, 2004, and who currently resides in St. Lucia, an independent country within the British Commonwealth. From 1998 until 2002, Mr. Pollock resided in Dominica, another island nation in the Caribbean Sea. Mr. Pollock continuously maintained, through at least January of 2006, an accounting practice with a post office box address in Winter Park, Florida.

Paul Morgan Jones is a citizen of the United States who maintains a Florida driver's license. From 1998 until 2002, Mr. Jones also resided in Dominica. Mr. Jones carries both a United States and a Dominica passport.

In the early 1990s, Mark Ellison invited Mr. Pollock to Dominica to look at a large tract of land, Point Round, that Mr. Ellison sought to develop. The development did not occur. In 1995, Mr. Pollock learned from Reginald Shillingford, a part owner of Point Round, that Dominica had enacted new legislation permitting offshore banking and financial industry development. Mr. Pollock became interested in financing a bank in Dominica.

Mr. Pollock first learned of Mr. Homa through his brother. In March 1998, Mr. Pollock met in Florida with Mr. Homa and several other potential investors. They discussed the tract of land in Dominica and the possibility of starting a bank to assist in the development of the property.

Mr. Pollock then prepared a written document, the prospectus,[6] to solicit Mr. Homa's investment in the bank that he and Mr. Jones hoped to finance in Dominica, Banc Caribe. The prospectus contemplated a minimum of 500,000 shares at $10 per share for a total of $5,000,000,[7] and reflected an ultimate goal of raising a maximum of $15,000,000 in equity for the bank. Mr. Pollock again met with Mr. Homa on April 27, 1998, in Florida. At that time, Mr. Pollock presented Mr. Homa with the Banc Caribe prospectus.[8] Mr. Homa indicated that he was interested in the proposal and that he would like to meet Mr. Jones.

Mr. Pollock, Mr. Jones and Mr. Homa met together in May 1998. Shortly thereafter, Mr. Homa indicated that

---

[6] The terms of the investment were set out in the offering circular section of the prospectus. The offering circular specifically stated that shares of purchase of the common stock of the bank were to be offered to residents of Florida. That section also required an investor to complete and submit a "Subscription Agreement."

[7] Mr. Pollock believed that a minimum of $5,000,000 was needed for the Banc Caribe project to succeed.

[8] All of Mr. Homa's future meetings with Mr. Jones and Mr. Pollock, except the conversation that took place in Dominica at the bank's first board of directors meeting in January 1999, took place in Florida or Georgia.

he would pursue the Banc Caribe plans with Mr. Pollock and Mr. Jones, but that he wanted no other partners or investors in the project. Mr. Pollock and Mr. Jones agreed.

The precise terms of Mr. Homa's investment in the Banc Caribe project are uncertain. The parties never signed a contract or otherwise reduced their agreement to writing. Moreover, as we shall discuss below, throughout the venture the parties ignored the terms of other documentation created during the Banc Caribe project. In the district court, Mr. Pollock identified at least three possible sources for determining the terms of the agreement between himself, Mr. Jones and Mr. Homa: the prospectus, the investment promissory notes and oral conversations with Mr. Homa. These three sources are in conflict regarding key terms of the agreement.[9]

After Mr. Homa indicated his intention to go forward with Banc Caribe, Mr. Pollock and Mr. Jones worked quickly to establish an offshore account through which Mr. Homa could transfer large amounts of C4T money out of the United States. Mr. Pollock first created Caribbean Ventures International, Ltd. ("Caribbean Ventures") as a holding company for the bank's equity. The shares of

---

[9] Mr. Pollock, Mr. Jones and Mr. Homa agreed that Mr. Homa could provide the investment capital in installments. This represented the first deviation from the terms of the prospectus. They also agreed that Mr. Homa's investment was not intended as a loan; no payment of interest or other payment was contemplated by any of the parties to the venture, and Mr. Homa was entitled to stock in the bank in exchange for his investment. However, no subscription agreement, as required by the terms of the prospectus, ever was drafted or signed.

Caribbean Ventures were held by Mr. Shillingford, who also was a director of Caribbean Ventures. Mr. Pollock and Mr. Jones filled the remaining director positions in Caribbean Ventures.

Mr. Pollock, Mr. Jones and Mr. Homa planned to put the funds from the offering into Caribbean Ventures and then have Caribbean Ventures apply for a banking license in Dominica so that Banc Caribe could become a legal entity. Then, the funds in Caribbean Ventures would be transferred to Banc Caribe and shares in the bank would be issued, possibly pursuant to the terms of the offering in the prospectus.[10] In accordance with this plan, on June 5, 1998, Mr. Homa, through Sunset Financial, wire transferred his initial $500,000 investment in Banc Caribe to the account of Caribbean Ventures at the Commercial Bank of Dominica. On March 16, 1999, Mr. Homa invested a second installment of $500,000 in the same manner.

Mr. Pollock then drafted an investment promissory note that documented Mr. Homa's first investment of $500,000 in Banc Caribe.[11] He later drafted a second note with

---

[10] The offering circular, however, actually called for all investments to be held by an escrow agent until such time as the minimum $5,000,000 capital was aggregated. At that point, the common stock of the bank was to be issued. The offering circular specified that the escrow agent would be Banc Caribe. The initial investments could not be held by Banc Caribe, however, because the bank could not exist until it was licensed, and under Dominican law it could not be licensed until a minimum amount of initial investment money, $1,000,000, was available.

[11] The note stated that Mr. Homa's initial $500,000 investment was given in exchange for common shares of Banc Caribe stock

(continued...)

identical terms for the second investment of $500,000. These notes served as the second alleged source of the terms of the agreement between Mr. Pollock, Mr. Jones and Mr. Homa. Notably, Mr. Homa took no part in the creation of the notes, never signed them and did not have possession of them. Mr. Jones also had no knowledge of the notes; he did not see them until 2004. The true purpose of the notes was to support the bank license application and to prove to the regulators in Dominica that Banc Caribe had met the minimum requirement of $1,000,000 in unrestricted capital.

On June 12, 1998, Mr. Pollock, Mr. Jones and Caribbean Ventures filed Banc Caribe's Articles of Incorporation with the Government of Dominica. On August 18, 1998, Banc Caribe filed its application with Dominica. When it applied for its license, Banc Caribe was funded with $1,000,000, the minimum capital requirement under the law of Dominica. It opened for business shortly thereafter.

---

[11] (...continued)
issued in the names of Mr. Pollock and Mr. Jones, when Sunset Financial had provided at least $5,000,000 under the terms of an "investment agreement" between the parties. The note does not clarify whether the "investment agreement" it mentioned referred to the prospectus or some other understanding, documented or undocumented, between the parties.

The note also said that, in the event of a default on the investment obligations of Sunset Financial to Caribbean Ventures under the prospectus dated April 27, 1998, the note would be cancelled. The note's reference to the prospectus is confusing because Mr. Pollock prepared the note specifically because the investment terms in the prospectus were not going to be followed.

Mr. Homa, through Sunset Financial, later paid an additional $2,000,000 to Caribbean Ventures, for a total investment of $3,000,000 in Banc Caribe. No other investment promissory notes were prepared to document this subsequent $2,000,000 investment from Mr. Homa. Banc Caribe did not receive a capital contribution from any source other than Mr. Homa. Caribbean Ventures owned all the stock of Banc Caribe.

Mr. Pollock identified the third source of the agreement between the parties as a series of conversations with Mr. Homa. Mr. Pollock was inconsistent in his representations to the court regarding which of these three sources of the agreement controlled on any given point, and the court found him to be entirely without credibility.[12]

---

[12] Mr. Pollock asserted that he, Mr. Jones and Mr. Homa had agreed that no one would own Banc Caribe until at least the minimum amount of capital, presumably $5,000,000, was invested. Until that minimum was met, Mr. Shillingford, through Caribbean Ventures, was the holder of Banc Caribe's stock. Mr. Pollock also testified that, if the minimum investment was not met, the notes would be cancelled and Mr. Pollock and Mr. Jones would be the sole owners of Banc Caribe.

The prospectus, by contrast, called for the return of the money to investors if the minimum was not achieved. The prospectus stated that all investor funds would be held in escrow until the Banc Caribe project had $5,000,000. No escrow agreement ever was prepared, however. Ultimately, neither the $5,000,000 minimum nor the $15,000,000 maximum investment in Banc Caribe ever was reached, but Mr. Pollock and Mr. Jones nevertheless commenced operations in the bank.

Mr. Pollock and Mr. Jones never explained several fundamental aspects of their transaction with Mr. Homa. They did

(continued...)

Banc Caribe began doing business in September 1998, subject to the banking laws of Dominica. Mr. Jones served as its president and secretary, and Mr. Pollock served as the managing director and chief financial officer. Mr. Pollock leased approximately 6,000 square feet of space for the bank, and its doors officially opened in October 1998. In January 1999, Mr. Homa was designated as the Chairman of the Board of Directors of Banc Caribe.

## C.

On October 15, 1999, the SEC brought a civil suit against Mr. Homa and C4T, the combined Ponzi-scheme entities. The district court entered the first freeze order against Mr. Homa and C4T on that day, and a second, clarifying order on October 18. By that time, Banc Caribe had between 100 and 150 accounts, and it had expanded to fifteen employees.

Sunset Financial, one of Mr. Homa's corporate entities that was specifically mentioned in the freeze orders, had an account at Banc Caribe.[13] Sunset Financial's account

---

[12] (...continued)

not explain why there was no signed subscription agreement between the parties and no written signed shareholder's agreement. They did not describe how bank profits would be divided if there were no shareholders, or why Mr. Homa and Mr. Jones never were involved with the notes in any way. Finally, they did not explain why Mr. Homa did not possess the notes.

[13] In July or August 1999, Sunset Financial's account name was changed, at Mr. Homa's request, to EAVH Holding. All

(continued...)

held approximately $5,793,000 of the $8,000,000 in total deposits in Banc Caribe. Mr. Homa also controlled other entities, however, including Caribbean Air and Caribbean Realty, that had accounts at Banc Caribe. The total funds that could be attributed to Mr. Homa, therefore, accounted for more than 90% of the deposits in the bank.

The record suggests that Mr. Pollock and Mr. Jones first became aware of Mr. Homa's legal trouble when, on October 17, 1999, Mr. Pollock saw an article in a Florida newspaper concerning the SEC action against Mr. Homa. That article described allegations that Mr. Homa had been laundering money from an international Ponzi scheme.

Mr. Pollock and Mr. Jones met in Dominica to discuss the situation and decided to ask Mr. Homa to resign from the board of directors. They called Mr. Homa on October 17, and Mr. Homa agreed to resign. Mr. Homa allegedly did not inform Mr. Pollock of the freeze order at that time. On October 18, Mr. Pollock and Mr. Jones held an emergency meeting of Banc Caribe's board of directors and removed Mr. Homa as a director of the bank.[14]

On October 18, Banc Caribe also attempted to initiate a transaction with Dain Rauscher, one of Banc Caribe's

---

[13] (...continued)
else remained the same. Both names refer to the same account, established by Mr. Homa at Banc Caribe and holding C4T funds.

[14] The minutes of the meeting indicate that this action actually occurred on October 17, 1999, but Mr. Pollock described that entry as a typographical error.

correspondent banks.[15] Dain Rauscher informed Mr. Pollock that there was a problem with Banc Caribe's account. Mr. Pollock learned from Dain Rauscher's legal department that the account was locked. Mr. Pollock knew at that time that the problem stemmed from a freeze order. At 2:48 p.m. on October 18, Dain Rausher faxed a copy of the October 15 freeze order to Mr. Pollock and Mr. Jones.

Sometime after receipt of the order, Mr. Jones, with the knowledge and authorization of Mr. Pollock, directed that Paine Webber wire transfer $1,975,000 out of Banc Caribe's Paine Webber correspondent banking account in the United States to Banc Caribe's correspondent banking account at Alpha Credit Bank in Athens, Greece.[16] The funds actually were transferred to the Alpha Credit Bank on October 20, 1999, and the transfer likely was ordered on that day. The transfer lacked any business reason; it was initiated solely to circumvent the freeze order.

Sometime thereafter, Mr. Pollock retained an attorney for Banc Caribe. Banc Caribe began negotiating with the SEC on October 20, 1999. On October 26, 1999, the SEC and Banc Caribe entered into a resolution regarding the transfer of certain assets and the repatriation of others held in

---

[15] A correspondent bank is an intermediary bank that a primary bank uses to facilitate currency transactions in the country in which the intermediary bank is located.

[16] Mr. Pollock and Mr. Jones had the freeze order in their possession before they expected the transfer to be complete. Mr. Jones testified that he made a conscious decision, based on his interpretation of the freeze order, that the funds could be transferred.

Banc Caribe for the benefit of C4T entities. This accommodation ensured that Banc Caribe had the liquidity that Mr. Pollock believed it needed to function.

Sometime between October 20 and 26, 1999, Caribbean Ventures determined that Mr. Homa, because of his legal difficulties, would be unable to invest the full amount that Mr. Pollock testified Mr. Homa had agreed to contribute. Therefore, Caribbean Ventures determined that Mr. Homa was in default and cancelled the notes. Mr. Pollock and Mr. Jones were the sole officers of Caribbean Ventures, but Mr. Jones did not take part in cancelling the notes. Additionally, Mr. Pollock did not tell Mr. Homa, Sunset Financial or anyone else that Mr. Homa was in default or that the notes had been cancelled. Neither Mr. Pollock nor Mr. Jones ever informed the SEC of Mr. Homa's rights under the agreement, the existence of any agreement or that Caribbean Ventures unilaterally had determined to "cancel" the notes. Mr. Pollock and Mr. Jones also failed to inform the district court, SEC or any other authority that they had voided unilaterally Mr. Homa's right to bank ownership and to the money he had invested in the bank.[17] Through these actions, Mr. Pollock and Mr. Jones effectively transferred to themselves all the value represented by Mr. Homa's $3,000,000 invest-

---

[17] Mr. Pollock, Mr. Jones and Banc Caribe negotiated with the SEC regarding their compliance with the terms of the freeze order. The district court found that their failure to inform the SEC of the cancellation was not an oversight or a passive failure to come forward with information. It found that their determination not to inform the SEC of Mr. Homa's assets in the bank was a conscious and deliberate decision to hide Mr. Homa's claim to equity in the bank.

ment in Banc Caribe. This transfer occurred after Mr. Pollock and Mr. Jones had actual notice of the freeze orders.

Mr. Pollock also closed Mr. Homa's Sunset Financial account. Between October 19 and 21, 1999, before closing the account, Mr. Pollock invoked Banc Caribe's right to set-off against Sunset Financial's account. He offset $2,216,462.76 from Mr. Homa's Sunset Financial account over the course of four withdrawals.[18] No one contacted the SEC or the district court before making the withdrawals. These set-offs occurred after Mr. Pollock and Mr. Jones received actual notice of the freeze orders, and the money was taken from the account of Sunset Financial, an account over which Mr. Homa had signatory authority.

One of the set-offs from Sunset Financial's account related to a home that Mr. Homa had arranged to purchase through Banc Caribe.[19] Banc Caribe declared Mr. Homa to

---

[18] One withdrawal, $703,595.89, occurred on October 19. Three others occurred on October 21, for $564,880.00, $851,386.87 and $96,600.00.

[19] The purchase and lease of this home for Mr. Homa serves as an example of the true function of Banc Caribe. Mr. Pollock, Mr. Jones and Mr. Homa arranged for an entity called Caribbean Realty, a subsidiary of Caribbean Ventures, to purchase a property in Orlando with money fronted, purportedly, by Banc Caribe. At least $500,000 of the purchase money, however, came directly from Sunset Financial's account at Banc Caribe. Caribbean Realty then leased the property to Mr. Homa, who in turn debited Sunset Financial's account at the bank for the lease payments, which Caribbean Realty then used to pay Banc Caribe for the purchase money mortgage loan.
(continued...)

be in default on the home's lease, even though no payments had been missed. The bank asserted that an accelerated lease payment of $851,000 was immediately due, and it removed the money from Sunset Financial's account.[20] Banc Caribe had no rights under the lease, however, which was purportedly between Mr. Homa and Caribbean Realty. Mr. Pollock did not accelerate Caribbean Realty's lease payments; instead, he went directly to Mr. Homa's money in the Sunset Financial account. In all, Sunset Financial paid at least $1,351,000 for the purchase of a home to which neither Sunset Financial nor Mr. Homa ever obtained legal title. The home was then sold and the proceeds went to companies with which Mr. Pollock had entered into an employment agreement. None of the benefit accrued to Mr. Homa or to Banc Caribe.

### D.

Caribbean Ventures sold its stock interest in Banc Caribe through two transactions, one with Witherspoon Financial in July 2000 and the other with Aristocrat Trust in

---

[19] (...continued)

Mr. Homa was supposed to receive some credit for his payments for a home that would end up in the name of Caribbean Realty, but they apparently planned to establish the actual terms at a later date.

[20] Mr. Jones also demanded and received from Mr. Homa an additional $14,000 in rent in December 1999. Mr. Jones asserted that the lease had been terminated, and thus, Mr. Homa's tenant in the house was a holdover tenant who owed rent. Mr. Jones accepted the check from Mr. Homa well after the freeze orders were in place.

December 2000. Witherspoon Financial paid $2,000,000 for a 40% interest in Banc Caribe. Although Mr. Jones went to great lengths to hide his benefit from the sale, he kept the $1,000,000 from that first sale for himself by diverting it through a shell corporation, Morgan Global Capital,[21] created for that purpose. Aristocrat Trust paid $3,000,000 for the remaining interest in Banc Caribe. After the sale of Banc Caribe was complete, another $1,500,000 was diverted through Morgan Global Capital for Mr. Jones. The total consideration for the sale of Banc Caribe was $5,000,000.

Mr. Pollock's benefit from the sale remained in Caribbean Ventures. Mr. Pollock was the sole employee of Caribbean Ventures. His employment commenced in January or February of 2003 and continued through the summer of 2005. He later sued Caribbean Ventures for $1,500,000, the value of his employment contract with that company. Mr. Pollock also sued Banc Caribe for the value of his employment contract with it and for $700,000, the value of an airplane lease on which Banc Caribe had defaulted.[22] Additionally, Mr. Pollock received more than $750,000 in loans from Caribbean Ventures for the purchase of his home and other items, which he never repaid. Caribbean Ventures also distributed $250,000 to Mr. Pollock, Mr. Jones and Mr. Shillingford for the purchase and improvement of land in Dominica.

---

[21] The "Morgan" in Morgan Global Capital is the Morgan in Mr. Jones' middle name.

[22] The airplane was only worth $300,000. It was owned by Carribean Air, one of Mr. Homa's companies in which Mr. Pollock held an interest.

These transactions reinvested the proceeds of Mr. Homa's criminal enterprises into shell entities. The end result was that Mr. Pollock and Mr. Jones ended up with a significant amount of money from the Ponzi scheme proceeds by means of leases, loans and employment contracts that were nothing more than window dressing.

### E.

On May 1, 2003, at the request of the receiver, the district court entered an order to show cause why Mr. Pollock and Mr. Jones should not be held in contempt for their actions taken in violation of the freeze order. On June 3, 2003, the court froze Bank Caribe's assets with a preliminary injunction against any transfers. On March 31, 2004, it issued an opinion and order in which it determined that it had jurisdiction over the bank, Mr. Pollock and Mr. Jones. This show cause order was later amended on March 16, 2005.

Between February 1 and 3, 2006, the district court held an evidentiary hearing on the amended Rule to Show Cause as to why Mr. Pollock and Mr. Jones should not be held in contempt for violating the freeze orders. On August 3, 2006, the court found Mr. Pollock and Mr. Jones in civil contempt and ordered that they jointly and severally disgorge approximately $7,216,462.76, plus prejudgment interest and costs. The court further ordered Mr. Pollock and Mr. Jones to appear personally before the court on August 31, 2006, and to provide the court with a specific plan and timetable for the payment of the money. The court specified that willful failure to comply with the order would result in the issuance of body attachment orders.

In that order, the district court found by clear and convincing evidence that Mr. Pollock and Mr. Jones, by their direct and indirect actions, had violated the freeze orders and engaged in three contemptuous acts. First, they had transferred $1,975,000 from Banc Caribe's Paine Webber account to the Alpha Credit Bank in Athens, Greece. Second, Mr. Pollock and Mr. Jones had cancelled Mr. Homa's notes and ownership in Banc Caribe, then misappropriated the funds from the sale of Banc Caribe for their own use. Finally, they had set-off $2,216,462.76 in Mr. Homa's Sunset Financial account at Banc Caribe. The district court ordered Mr. Pollock and Mr. Jones to return to the receiver the funds lost in the second two transfers. Specifically, the court ordered Mr. Pollock and Mr. Jones to disgorge the $5 million from the sale of Mr. Homa's interest in Banc Caribe and the $2,216,462.76 they had set-off from Mr. Homa's Sunset Financial account. The money from the first transfer to Alpha Credit was recovered by the receiver from another source.

The district court found that Banc Caribe and the C4T entities did not maintain any formality or distinction between the assets that belonged to one or the other because the bank was a mere pretense. The court found Banc Caribe to be only a convenient structure within which to hold Ponzi scheme money for the benefit of Mr. Homa, Mr. Pollock and Mr. Jones.[23] Therefore, the court

---

[23] The district court noted that the bank's nature was shown by the fact that the bank was "owned" by Mr. Shillingford, essentially no one but a straw man, yet none of the parties involved were bothered by that arrangement. It was also demonstrated by the fact that Banc Caribe made no distinction

(continued...)

determined that Mr. Pollock and Mr. Jones had violated the freeze orders by acting in concert with an enjoined person to dissipate protected assets, even if neither Mr. Homa nor a C4T entity had direct signatory authority over the accounts that transferred funds.

Finally, the district court determined that, even assuming the existence of a legitimate banking relationship between Sunset Financial and Banc Caribe, the money in Banc Caribe's Paine Webber account was an asset of Sunset Fiancial, and therefore directly was subject to the freeze order. Mr. Jones admitted that the $2 million transferred from the Paine Webber account was being held by Banc Caribe for the benefit of Sunset Financial. Mr. Pollock and Mr. Jones were aware of these facts, and that Sunset Financial's funds were subject to a freeze order, when they transferred $1,975,000 of that money from the Paine Webber investment account to Alpha Credit Bank in Athens, Greece.

On August 31, 2006, Mr. Jones appeared as ordered by the court, but he did not offer a plan to purge his contempt. Mr. Jones therefore was confined to the Bureau of Prisons to encourage his compliance with the award. He was released on October 3, 2006, pursuant to an agreed order. As of March 5, 2007, Mr. Jones had paid $612,953.83 to the receiver.

On August 28, 2006, Mr. Pollock timely filed his notice of appeal of the finding of contempt. Mr. Pollock did not appear at the August 31 hearing, and the district court

---

[23] (...continued)
between Mr. Homa's money and its own money, as shown by the transaction involving the lease of Mr. Homa's Florida home.

issued a body attachment order against him. On September 7, 2006, the district court renewed the body attachment order against Mr. Pollock, again directing the United States Marshal to arrest him and bring him before the court.

On October 17, 2006, the receiver began to pursue Mr. Pollock's assets. The court had learned from Mr. Jones that Mr. Pollock had used his portion of the proceeds from the sale of Banc Caribe to purchase a home in St. Lucia and three luxury yachts. The yachts were traced to CVI2, a closely-held Delaware corporation that had been incorporated in 2000 and that was owned exclusively by Mr. Pollock. The receiver filed a motion for a temporary restraining order against CVI2 and sought to be appointed temporary receiver of CVI2 in order to liquidate its assets.

On October 24, CVI2 appeared through counsel and admitted that Mr. Pollock was part owner of CVI2 but contended that Kelly Pollock, Mr. Pollock's wife, was the controlling shareholder. CVI2 agreed to produce Kelly Pollock for a deposition on October 31 and further agreed that it would attempt to produce Mr. Pollock. On October 30, however, CVI2 sought permission to conduct the deposition from St. Lucia, rather than in Chicago. The court denied the request, and CVI2 refused to produce any witnesses for deposition. In response, the receiver moved for sanctions against CVI2 on October 31, 2006. The district court denied CVI2's motion to dismiss for lack of jurisdiction on November 6, 2006.

On November 14, 2006, the court authorized the issuance of subpoenas duces tecum to Mr. Pollock and Kelly Pollock so that the receiver could explore their interests in CVI2 and the company's source of funding. The infor-

mation was necessary to determine the receiver's motion, which alleged that CVI2's assets were subject to seizure to satisfy the contempt judgment against Mr. Pollock. The court specifically notified CVI2, Mr. Pollock and Kelly Pollock that failure to comply with the court's order could result in the court defaulting CVI2. The subpoenas issued on November 15, and depositions for Mr. Pollock and Kelly Pollock were scheduled for November 29, 2006. Process was effectuated by fax and mail, and a process server attempted personal service at the Pollock's home on November 17, 20, 24, 28 and 29.

CVI2 failed to produce any witness, and neither of the Pollocks appeared for deposition. The court determined that the Pollocks' depositions were essential to the preparation of the receiver's case because the Pollocks were the only persons with access to and control over CVI2's corporate records. On December 14, 2006, the receiver moved for an order of default against CVI2, a turnover of assets, injunctive relief and for his appointment as CVI2's receiver.

On March 5, 2007, the district court determined that it had no lesser means of curing the Pollocks' willful refusal to comply with the court's orders than by defaulting CVI2. It did so, and took as confessed the allegations in the receiver's motion for the turnover of CVI2's assets. The court ordered CVI2 to turn over all of its assets to the receiver.

CVI2 timely filed its notice of appeal on March 15, 2007. On March 19, 2007, CVI2's appeal was consolidated with the appeals of Mr. Jones and Mr. Pollock.

**II**

**DISCUSSION**

**A.**

We review de novo questions of in personam jurisdiction. *Cent. States, Se. and Sw. Areas Pension Fund v. Phencorp Reins. Co.*, 440 F.3d 870, 875 (7th Cir. 2006). The district court took the view that it had personal jurisdiction over Mr. Jones and Mr. Pollock because, although they were nonparties who reside outside the territorial jurisdiction of the United States, they were American citizens who knowingly had violated the court's freeze order and "actively aid[ed] and abet[ted] a party in violating that order." *Waffenschmidt v. MacKay*, 763 F.2d 711, 714 (5th Cir. 1985). The district court was correct.

In *Waffenschmidt*, our colleagues of the United States Court of Appeals for the Fifth Circuit articulated succinctly the basic principles of law that must govern our assessment:

> Nonparties who reside outside the territorial jurisdiction of a district court may be subject to that court's jurisdiction if, with actual notice of the court's order, they actively aid and abet a party in violating that order. This is so despite the absence of other contacts with the forum.

*Id.* This summary embodies several points of independent importance. We shall examine each briefly.

First, a court possesses the independent authority to enforce its own injunctive decrees. *Id.* at 716. In this respect, Rule 65(d), which governs the contents and scope of injunctions, must be regarded as a codification rather than a limitation on a federal court's inherent power to

protect its ability to render a binding judgment. *Berry v. Midtown Serv. Corp.*, 104 F.2d 107, 110 (2d Cir. 1939).

Second, the injunctive mandate of a federal court runs nationwide, and the issuing court has the authority to deal with defiance of its order regardless of where that defiance occurs. *Waffenschmidt*, 763 F.2d at 716. Indeed, the court whose order was defied must enforce the injunction through the contempt power because contempt is, in essence, an affront to the court that issues the order. *Id.* As the Supreme Court put it in *In re Debs*:

> [T]he power of a court to make an order carries with it the equal power to punish for a disobedience of that order, and the inquiry as to the question of disobedience has been, from time immemorial, the special function of the court. And this is no technical rule. In order that a court may compel obedience to its orders, it must have the right to inquire whether there has been any disobedience thereof. To submit the question of disobedience to another tribunal, be it a jury or another court, would operate to deprive the proceeding of half its efficiency. . . . [E]very court, at least of the superior kind, in which great confidence is placed, must be the sole judge, in the last resort, of contempts arising therein.

158 U.S. 564, 594-95 (1895), *abrogated in the criminal contempt context as recognized by United States v. Dixon*, 509 U.S. 688 (1993).

Third, an injunction binds not only the parties to the injunction but also nonparties who act with the named party. Commenting on Rule 65(d), the Supreme Court has noted that the Rule

is derived from the commonlaw doctrine that a decree of injunction not only binds the parties defendant but also those identified with them in interest, in "privity" with them, represented by them or subject to their control. In essence . . . defendants may not nullify a decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding.

*Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945). In *Stotler v. Able*, 870 F.2d 1158, 1164 (7th Cir. 1989), we specifically noted the vitality of this rule and its implementation through Rule 71. Indeed, if courts did not have the power to punish those who cooperate with those named in an injunction, the named parties could easily thwart the injunction by operating through others.

In *Stotler*, we held that "ordinarily a court may find a nonparty in contempt if that person has 'actual knowledge' of the court order and 'either abets the [party named in the court order] or is legally identified with him.' " 870 F.2d at 1164 (addition in original). There, the district court declined to hold the nonparty in contempt because it dismissed the case without specifying "any course of action to be undertaken by any person." *Id.* Even so, the court indicated that where "obedience to an order may be lawfully enforced against a person who is not a party, that person is liable to the same process for enforcing obedience to the order as if a party." *Id*.

Applying the rule in *Stotler* here, a person who knowingly circumvents a freeze order is subject to a show cause order and contempt and thereby submits to the jurisdiction of the court for contempt proceedings, as held in *Waffenschmidt*. 763 F.2d at 714; Fed. R. Civ. P. 65. "Nonparties who reside outside the territorial jurisdic-

tion of a district court may be subject to that court's jurisdiction if, with actual notice of the court's order, they actively aid and abet a party in violating that order. This is so despite the absence of other contacts with the forum." *Id.* Jurisdiction over persons who knowingly violate a court's injunctive order, even those without any other contact with the forum, is "necessary to the proper enforcement and supervision of a court's injunctive authority and offends no precept of due process." *Id.* at 716.

This rule is simply an application of two basic principles that govern the application of in personam jurisdiction in the United States. It has been long-established that, when an individual undertakes activity designed to have a purpose and effect in the forum, the forum may exercise personal jurisdiction over that person with respect to those activities. *See Calder v. Jones*, 465 U.S. 783, 788-89 (1984); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980); *Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945); *see also Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985). *See generally* Restatement of Foreign Relations Law § 421; Restatement (Second) of Conflicts of Law. There can be no doubt that Mr. Jones and Mr. Pollock undertook activities outside the United States that were designed to have the purpose and effect within the United States of frustrating the district court's freeze order. More important, as citizens of the United States, Mr. Jones and Mr. Pollock were required, once they had adequate notice, to obey the order of a United States court directed at them and their activities. *See Blackmer v. United States,* 284 U.S. 421, 438 (1932).

The district court determined that Mr. Jones and Mr. Pollock had acted in concert with Mr. Homa, the defendant in the underlying action. It further determined that

these individuals had actual knowledge of the court's order. These findings are supported by the record. *Waffenschmidt*, 763 F.2d at 717. Indeed, contrary to the defendants' assertion, this is not a case in which the district court relied on sparse background information. Rather, the district court drew its conclusions from extensive hearings. It determined that Mr. Jones and Mr. Pollock had been contumacious and untruthful. Those findings are supported by the record.

Mr. Pollock and Mr. Jones knowingly acted in concert with Mr. Homa to violate the court's order. Therefore, they subjected themselves to a show cause order and the subsequent contempt proceedings. *See id.*; Fed. R. Civ. P. 65. The district court properly determined that it had personal jurisdiction over Mr. Pollock and Mr. Jones.[24]

---

[24] The district court also determined that it had personal jurisdiction over Mr. Pollock and Mr. Jones because the Securities and Exchange Act, 15 U.S.C. §§ 77v(a) and 78aa, authorizes worldwide service of process on defendants, limited only by due process. Because we hold today that nonparties who reside outside the territorial jurisdiction of a district court may be subject to that court's jurisdiction if, with actual notice of the court's order, they actively aid and abet a party in violating that order, we need not decide whether the Securities and Exchange Act authorizes worldwide service of process.

Similarly, we decline the receiver's request that we dismiss Mr. Pollock's appeal under the fugitive disentitlement doctrine. There is no reason to invoke the fugitive disentitlement doctrine to dismiss Mr. Pollock's appeal because we must consider on appeal the substantially identical issues presented by Mr. Jones. This case therefore does not provide an occasion on which to decide the contours of this doctrine.

**B.**

Having determined that the district court correctly held that it had in personam jurisdiction over Mr. Pollock and Mr. Jones, we next address whether the district court correctly determined that the receiver had proved contempt by clear and convincing evidence.

We review the district court's civil contempt order for abuse of discretion. *Feltner v. Title Search Co.*, 283 F.3d 838, 841 (7th Cir. 2002). The receiver had the burden of showing contempt by clear and convincing evidence. *United States v. Dowell*, 257 F.3d 694, 699 (7th Cir. 2001).

### 1. The Transfer of Funds from America to Greece

The record supports the district court's finding that Mr. Jones and Mr. Pollock knew of the freeze order before transferring funds from Banc Caribe's account at Paine Webber to a correspondent account in Alpha Credit Bank in Athens, Greece. Mr. Jones and Mr. Pollock do not dispute that they had some awareness of the freeze order before the transfer in question because they had been unable to transfer Banc Caribe funds from another source, Dain Rauscher. Mr. Pollock had spoken with the legal department there about the trouble with Banc Caribe's account. He admitted that he had learned about the freeze order from this conversation with Dain Rauscher. Additionally, Greg Gibbs of Dain Rauscher's legal department also faxed the freeze order to Mr. Pollock. Banc Caribe's transfer to Alpha Credit did not go through until several days after Mr. Pollock and Mr. Jones admit that they had received the freeze order by fax. That interval would have provided them with time to stop the trans-

fer, if, as they contend, they had authorized the transfer before learning of the freeze order.

Mr. Jones and Mr. Pollock characterize the transaction as a mere transfer of bank funds from one Banc Caribe account to another. They admit, however, there was no reason for the transfer other than to avoid the freeze order. Mr. Jones further admits that he did not cancel the transfer because he did not wish to stop it and because he made a conscious determination that he believed the freeze order was ambiguous.

Mr. Pollock and Mr. Jones also contend that the funds transferred from Paine Webber to Alpha Credit were not subject to the freeze order because the funds belonged to Banc Caribe, not one of the C4T defendants. The district court properly determined, however, that Banc Caribe did not maintain any formalities between Mr. Homa's money and other assets. Therefore, even if Mr. Homa did not have signatory authority over the account from which the funds were transferred, Mr. Homa controlled the funds with the intent to use the bank to launder his Ponzi scheme proceeds. As described above, moreover, the money in the Paine Webber account was being held by Banc Caribe for the benefit of the Sunset Financial account.

The record establishes this knowing transfer of funds belonging to Sunset Financial, a defendant in the SEC case. The district court reasonably found Mr. Pollock and Mr. Jones in contempt for this transfer.[25]

---

[25] Ultimately, the district court did not order Mr. Pollock and Mr. Jones to return the $1,975,000 transferred from Banc Caribe's

(continued...)

### 2. The Cancellation of Mr. Homa's Interest in Banc Caribe

The record also amply supports the district court's findings that Mr. Jones and Mr. Pollock knew of the freeze order before they cancelled Mr. Homa's interest in Banc Caribe. The district court correctly determined that Mr. Homa's rights under whatever agreement he held with Banc Caribe were an asset. Even if the value of that interest might have been in dispute, the interests of Mr. Homa in Banc Caribe were specifically within the terms of the freeze order, and Mr. Jones and Mr. Pollock knowingly dissipated, transferred or concealed those assets after receipt of the freeze order. The district court did not abuse its discretion in determining that the shares were an asset of value belonging to Mr. Homa at the time that the appellants cancelled the notes.

### 3. The Set-off of Funds from the Sunset Financial Account

Finally, the record supports the district court's determination that Mr. Pollock and Mr. Jones violated the freeze orders by setting off, for their own benefit, $2,216,462.76 from Mr. Homa's Sunset Financial account. Shortly after cancelling Mr. Homa's interest in Banc Caribe, Mr. Pollock closed Mr. Homa's Sunset Financial account. Before closing the account, however, he invoked the bank's alleged right to set-off against the account by withdrawing $703,595.89

---

[25] (...continued)
account at Paine Webber in violation of the freeze orders. The receiver had already received compensation for that transfer from Paine Webber.

on October 19, 1999, and $564,880.00, $96,600.00 and $851,386.87 on October 21.

Mr. Pollock admitted that he did not contact anyone at the SEC or the district court before removing the funds from the Sunset Financial account. Mr. Pollock and Mr. Jones also admit that the removal of $2,216,462.76 from Mr. Homa's account occurred after actual notice of the freeze orders and involved money that, without dispute, came from an account over which Mr. Homa had signatory authority. Mr. Pollock and Mr. Jones subsequently converted that portion of Sunset Financial's assets to their own use.

This knowing set-off against monies in an account over which Mr. Homa had signatory authority is established in the record. The freeze orders enjoined the defendants in the SEC action and those people acting in concert with them from disposing of the funds in any manner, directly or indirectly. The district court was on solid ground in finding Mr. Pollock and Mr. Jones in contempt for this set-off.

Additionally, the record does not support Mr. Pollock's assertion that the freeze orders violated Dominican law. The district court found, and we agree, that the record does not establish that any law of Dominica prohibited Banc Caribe, Mr. Pollock or Mr. Jones from complying with the freeze order. Mr. Pollock and Mr. Jones suggest generally that Banc Caribe needed to maintain liquidity to protect its investors and patrons. They do not, however, point to any particular amount of liquidity that the bank was required to maintain, and neither does the record show that the bank lacked any necessary liquidity at any point.

Moreover, the district court's freeze order simply required that Mr. Pollock and Mr. Jones not move from the bank any funds associated with Mr. Homa or C4T. Two of their contumacious acts, the cancellation of Mr. Homa's interest in Banc Caribe and the set-off of Mr. Homa's funds in the Sunset Financial account, violated those freeze orders by removing funds from Banc Caribe for their own benefit. Compliance with the court's orders would have resulted in Mr. Pollock and Mr. Jones leaving the funds in Banc Caribe, which, in contrast to their actions, presumably would have improved the liquidity of the bank.

## C.

We now turn to whether the district court erred in defaulting CVI2 and in ordering the turnover of its assets. CVI2 first argues that, because it is not a party, a Rule 37 sanction of default judgment is inappropriate. We cannot accept this argument. *See Textile Banking Co. v. Rentschler*, 657 F.2d 844, 846-48 (7th Cir. 1981). It is clear that CVI2, through its officers, directors and shareholders, intentionally and willfully refused to comply with the district court's discovery orders.

The court properly found that, without compliance with its deposition subpoenas, the receiver was denied the ability to conduct crucial discovery that went to the heart of the receiver's petition for appointment as receiver of CVI2. The record also supports the district court's determination that Mr. Pollock and Mrs. Pollock are the only persons with complete knowledge of the crucial facts concerning the ownership and control of CVI2 and the only persons with possession and control of the corporate records of CVI2. This information was absolutely

essential to the preparation of the receiver's case. More-
over, the assertions in the receiver's amended verified
motion and the documents submitted by the receiver
corroborated the district court's determination that the
assets of CVI2 are owned by, and in the possession and
control of, Mr. Pollock as the alter ego of CVI2.

Therefore, the district court did not err when it deter-
mined that no lesser sanction than default would cure
CVI2's failure to comply with the district court's dis-
covery orders. Neither did the court err when it took as
admitted by CVI2 the allegations in the amended motion
to appoint the receiver of Mr. Homa's assets as receiver
for CVI2.

We also believe that the district court did not err in its
determination that it could exercise in personam juris-
diction over CVI2. The record supports the district court's
determination that CVI2 was an alter ego of Mr. Pollock.
The record supports the court's conclusion that the
entity was essentially no more than a sham structure to
contain the spoils of fraud and that Mrs. Pollock was not
a bona fide controlling shareholder.

Nor is there any question that the situation warranted
the sanctions imposed by the district court. The only
shareholders, Mr. and Mrs. Pollock, repeatedly refused
to comply with the court's orders to appear, to provide
discovery and to give a deposition. The district court's
determination that the refusal was willful and that no
lesser sanction would cure their failure to comply with
discovery was solidly supported by the record. The
court specifically found that the Pollocks are the only
persons with the information and materials crucial to
the case against CVI2, and it reasonably concluded that
no method other than in person depositions would suf-

fice. It also specifically warned CVI2 that repeated failure to comply with discovery requests would result in default if it did not produce its officers at the final deposition. In short, the district court, with record support, properly made the requisite findings before ordering a default judgment against CVI2. *See In re Thomas Consol. Indus., Inc.*, 456 F.3d 719, 724 (7th Cir. 2006) (holding that a finding of bad faith coupled with a warning about the sanction justified dismissal as a discovery sanction). The sanction of default is severe; however, it certainly was not an abuse of discretion to employ it here. *Sun v. Bd. of Trs.*, 473 F.3d 799, 811 (7th Cir. 2007).

## Conclusion

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*