[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
Oct. 30, 2009
THOMAS K. KAHN
CLERK

_____

No. 08-17258

_____

D. C. Docket No. 07-01675-CV-RWS-1

WORLD HARVEST CHURCH, INC.,

Plaintiff-Appellant,

versus

GUIDEONE MUTUAL INSURANCE COMPANY,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(October 30, 2009)

Before CARNES, FAY and ALARCÓN,[*] Circuit Judges.

CARNES, Circuit Judge:

This is an insurance case raising some questions of Georgia law.

_____

[*] Honorable Arthur L. Alarcón, United States Circuit Judge for the Ninth Circuit, sitting by designation.

Without issuing a written reservation of rights, an insurer assumed the defense of a lawsuit for almost eleven months but stopped defending near the end of the discovery period because it decided that there was no coverage. At that point the policy holder hired its own attorneys to defend the lawsuit. About one month after the new attorneys entered an appearance in the lawsuit, the insurer filed a motion for summary judgment. The policy holder's new attorneys filed a motion requesting more time for discovery, and that motion was denied. The case was transferred to another judge, who partially granted summary judgment to the plaintiff and awarded damages. The final judgment was entered about 17 months after the policy holder's new lawyers had filed notice of their appearance in the case. An appeal was taken but the plaintiff and policy holder later settled for a damage award of $1 million.

The policy holder, who is the plaintiff in this case, has filed this lawsuit against the insurer in an attempt to force the insurer to treat the earlier judgment as covered under the policy even though it actually was not.[1] Whether that attempt will succeed depends on the doctrine of waiver and estoppel.

---

[1] The district court agreed with the insurer that the claims in the underlying lawsuit against the insured were not covered by the policy. Although the insured refers to "purported noncoverage issues," it does not actually argue that the claims were covered. We take as a given that there was no coverage. See, e.g., Greenbriar, Ltd. v. City of Alabaster, 881 F.2d 1570, 1573 n.6 (11th Cir. 1989) (holding that issues not raised on appeal are deemed waived).

Under Georgia law, "risks not covered by the terms of an insurance policy, or risks excluded therefrom, while normally not subject to the doctrine of waiver and estoppel, <u>may be</u> subject to the doctrine where the insurer, without reserving its rights, assumes the defense of an action or continues such defense with knowledge, actual or constructive, of noncoverage." <u>Prescott's Altama Datsun, Inc. v. Monarch Ins. Co.</u>, 319 S.E.2d 445, 446 (Ga. 1984) (emphasis added) (citations omitted). The first issue this case presents is whether the insurer's actions effectively reserved its rights. If the answer to that issue is, as we believe, that they did not reserve its rights, the second and more difficult issue is whether the waiver and estoppel doctrine requires a showing that the insured actually was prejudiced by the insurer's assumption of the defense. And, if actual prejudice must be shown, the third issue is whether the facts of this case do show it.

The only way we can be sure that the state law questions that underlie those three issues are answered correctly is to certify them to the Georgia Supreme Court. <u>See</u> <u>Blue Cross & Blue Shield of Ala., Inc. v. Nielsen</u>, 116 F.3d 1406, 1413 (11th Cir. 1997) (noting that the final arbiter of state law is the state supreme court, which means it is the only authoritative voice on that state's law).

3

# I.

Between 1995 and 1999, Michael E. Gause and Charles Richard Homa operated an automobile title lending business called Cash 4 Titles or C4T, which was actually an elaborate Ponzi scheme. See SEC v. Homa, 514 F.3d 661, 664 (7th Cir. 2008). Innocent investors in that scheme lost more than $165,000,000. Id. During that time Gause, who was a member of World Harvest Church, donated a great deal of money to it. His donations included a $1 million wire transfer from a Cayman Islands bank account.

In October 1999 government officials arrested Gause and Homa for operating the Ponzi scheme. SEC v. Homa, No. 99 C 6895, 2004 WL 1093492, at *1 (N.D. Ill. May 13, 2004) (unpublished). The Securities and Exchange Commission then filed a civil enforcement lawsuit against Gause, Homa, and the other Ponzi scheme participants.[2] Id. World Harvest was not a defendant in the SEC lawsuit. See id.

The SEC lawsuit proceeded in federal district court in Illinois, and in November 1999 that court appointed Phillip Stenger as Receiver to marshal and conserve for the benefit of investors the assets of the individuals and the entities involved in the Ponzi scheme. Id. ("The Receiver's general mandate is to marshal

---

[2] The SEC lawsuit was originally filed in federal district court in New York but was transferred to federal district court in Illinois. See Homa, 2004 WL 1093492, at *1.

4

C4T related assets for the benefit of investors.").  At the conclusion of the SEC lawsuit, Homa consented to a civil judgment in the amount of $157,993,830.25, plus $35,248,523.55 in prejudgment interest.  Homa, 514 F.3d at 665 n.3.  Gause also agreed to make a civil disgorgement in the amount of $193,242,353.80.  Stenger v. World Harvest Church, Inc. , No. Civ.A.1:04CV00151-RW, 2006 WL 870310, at *1 (N.D. Ga. March 31, 2006) (unpublished).  In 2000 Homa pleaded guilty to criminal charges of securities fraud and served time in prison.  See id.; Homa, 514 F.3d at 665 n.4.  In 2001 Gause pleaded guilty to securities fraud in federal district court in New York and was also sentenced to prison.  Stenger, 2006 WL 870310, at *1.

Continuing his work as Receiver, Stenger sought to recover additional money for the people who had invested in the Ponzi scheme.  In February 2001 Stenger demanded that World Harvest return about $1.8 million of Gause's donations.  He sent World Harvest a letter asserting that:

> [s]ince the money contributed by Gause and Pearson through their related entities was fraudulently obtained from the Cash 4 Titles ponzi scheme, the transfers were clearly fraudulent conveyances.  It makes no difference that the church may have received the funds in good faith or that the money may have already been spent on religious or charitable activities.  Controlling case law makes it clear that under such circumstances the Receiver is entitled to recover all funds and assets that the church received from Michael Gause, Dean Pearson and their related entities.

5

World Harvest did not return the money, so in November of 2002 Stenger filed a lawsuit against it in federal court in Illinois asserting fraudulent transfer and unjust enrichment claims. In February of 2003, Julie Loehr, Office Administrator for World Harvest, sent a letter to GuideOne Mutual on behalf of Pastor Mirek Hufton, informing GuideOne Mutual that the church had been named as a defendant in the Illinois lawsuit. Loehr's letter asked GuideOne Mutual to "provide clarification concerning either coverage for litigation costs or any indemnification coverage." Because the lawsuit had been filed in Illinois, GuideOne Mutual's Indianapolis office, GuideOne Elite Insurance Company, reviewed the claim.[3] In February 2003 GuideOne Elite responded with a certified letter to Loehr at World Harvest expressing concern about whether World Harvest's insurance policy covered the claims in the Illinois lawsuit. The letter explained to Loehr and to World Harvest that GuideOne Elite "reserve[d] the right to deny any and all liability." GuideOne Elite ultimately concluded that the policy did not cover the Illinois action. The Illinois federal lawsuit was later dismissed for lack of personal jurisdiction.

---

[3] World Harvest describes GuideOne Elite as GuideOne Mutual Insurance Company's sister company. GuideOne Mutual refers to GuideOne Elite as Guide One's "Indianapolis office." The difference does not matter to any of the issues on appeal. GuideOne Elite has since been dismissed from this suit.

In January 2004 Stenger filed a similar lawsuit (the lawsuit that would lead to this one) against World Harvest in the United States District Court for the Northern District of Georgia. The day after the lawsuit was filed, counsel for World Harvest called Dale Hubbell, who worked in the GuideOne Mutual Claims Department, and informed him about that lawsuit. World Harvest's counsel followed up his phone call with a letter to Hubbell, enclosing a copy of the complaint and the other documents that had been served on World Harvest. GuideOne Mutual determined that there were potential "coverage issues," so it "split the file." What that means is that GuideOne Mutual assigned one claims adjuster, Doug Sleezer, to address liability issues and a different adjuster, Dale Hubbell, to address coverage issues.

Hubbell testified in his deposition that he was assigned to determine whether the insurance policy covered "[a]ny or some of the claims" that had been made against World Harvest in the lawsuit Stenger had filed against World Harvest in Georgia. He also testified that Sleezer was assigned to "be in charge of handling the defense of this particular case for the underlying liability claims being made against the policy holder." In the present lawsuit Hubbell testified as follows about his conversation with World Harvest's counsel about the split file:

> My only conversation with [World Harvest's counsel] was, you know, we discussed early on that my handling of the case would be strictly

7

on any coverage issues and that if he needed to talk to someone in the office about liability issues it would have to go to Mr. Doug Sleezer who would be handling the defense of the case while myself would be undertaking the issues presented under the policy discussing with [World Harvest's counsel] that, you know, we didn't see coverage but we would have to evaluate what we have currently to see if there would be coverage issues.

In March 2004 the liability adjuster hired a law firm to defend World Harvest in the Georgia lawsuit. Neither at that time nor at any time thereafter did GuideOne Mutual send World Harvest a written reservation of its right to deny coverage. On January 26, 2005, Hubbell finally did send World Harvest a letter informing it that "GuideOne will not be in a position to indemnify World Harvest Church against the claims in [Stenger's Georgia lawsuit] because the damages sought by Phillip S. Stenger are not covered under the policy." Hubbell also informed World Harvest that "effective thirty (30) days from the date of this letter, GuideOne will no longer provide World Harvest Church with a defense." In light of that decision World Harvest hired some attorneys to represent it, and they entered an appearance in the lawsuit on March 15, 2005.

At the time the new attorneys came into the lawsuit, discovery had been underway for about 11 months, ever since the court had approved the parties' preliminary report and discovery schedule on April 22, 2004. On two separate occasions, the court granted joint motions by the parties to extend the discovery

period, ultimately setting the discovery deadline for January 17, 2005 and setting a deadline for summary judgment of February 7, 2005. On January 13, 2005, however, the parties filed a third joint motion for extension of time to complete discovery, and the court granted it, giving the parties until March 17, 2005 to complete discovery and setting summary judgment motion deadlines for April 6, 2005.

After those three extensions of the discovery deadline already had been granted, World Harvest's new attorneys made their appearance in the lawsuit, when there was a month remaining in the discovery period. They moved the court to extend the discovery deadline until May 17, 2005, but the court denied their motion. The judge presiding over the case recused himself on August 8, 2005, and the case was reassigned to another judge, who granted summary judgment in favor of Stenger on March 31, 2006. In July 2006 judgment was entered against World Harvest in the amount of $1.8 million, an amount later settled down to $1 million.

In July 2007, which was three months after that settlement, World Harvest filed this lawsuit against GuideOne Mutual in the United States District Court for the Northern District of Georgia. It claimed that GuideOne Mutual had breached the insurance contract and its duty to indemnify and defend the lawsuit that Stenger had filed against it in Georgia, had denied coverage in "bad faith" in violation of

9

Ga. Code § 33-4-6, and owed World Harvest attorney's fees and litigation expenses pursuant to Ga. Code § 13-6-11. World Harvest requested relief in the form of damages to include the $1 million settlement amount it had paid to Stenger, all of its litigation expenses from Stenger's Georgia lawsuit against it, and pre-judgment and post-judgment interest.[4] The parties filed cross-motions for summary judgment.

World Harvest's claims were based on its contention that GuideOne Mutual should be equitably estopped from denying coverage because it had represented World Harvest throughout much of Stenger's Georgia lawsuit without issuing a "reservation of rights." The district court rejected that contention, deciding that under Georgia law an insured had to show that "the insurer's participation prejudiced [its] defense" of the lawsuit before the insurer would be estopped from asserting the defense of noncoverage. The court found that World Harvest had not "demonstrated prejudice resulting from [GuideOne Mutual's] actions," which left GuideOne Mutual free to raise a noncoverage defense. World Harvest did not

_____

[4] To pay the $1 million settlement to Stenger, World Harvest obtained a bank loan for $1,835,000 along with a $275,000 revolving line of credit, and as security for that loan it assigned to the bank "any proceeds arising from [World Harvest's] contemplated litigation against Guide One Insurance Company . . . for Guide One's failure, as [World Harvest's] insurer, to defend [World Harvest]" in Stenger's Georgia lawsuit. R3:39 Ex. O, "Assignment of Litigation Proceeds."

10

argue that the Stenger lawsuit actually was covered by the policy, and the court found that it was not.

The district court also rejected World Harvest's claim that GuideOne Mutual denied the insurance claim in "bad faith." The court reasoned that under Ga. Code § 33-4-6 and the case law interpreting it an insured could prevail on a bad faith refusal to pay theory only when the loss actually was "covered under the insurance policy in dispute." Based on its earlier finding that the Stenger action was not covered under the policy, the court concluded that World Harvest could not prevail on its § 33-4-6 bad faith refusal to pay claim.

Finally, the court rejected World Harvest's claim for attorney's fees under Ga. Code § 13-6-11. In doing so it noted that § 33-4-6 is the "exclusive procedure to recover attorney's fees against an insurance company for a bad faith refusal to pay insurance proceeds." The failure of World Harvest's § 33-4-6 claim doomed its § 13-6-11 claim for attorney's fees.

This is World Harvest's appeal from the grant of summary judgment to GuideOne Mutual.

## II.

World Harvest contends that the district court erred when it concluded that before estoppel applies, an insured must show it was prejudiced by the insurer's

11

participation in its defense. Pointing to our decision in <u>Fidelity and Casualty Company v. Riley</u>, 380 F.2d 153, 156 (5th Cir. 1967),[5] World Harvest argues that prejudice should be "conclusively presumed." World Harvest alternatively contends that it was prejudiced because GuideOne Mutual's participation "precluded [it] from using counsel of its choice" and "deprived [it] of its right to control its own defense."

GuideOne Mutual responds that estoppel cannot apply in this case because its claims adjuster told World Harvest that he "did not see coverage," even though GuideOne Mutual never sent World Harvest a written document reserving its rights. Guideone Mutual essentially argues that it made an effective reservation of rights in Stenger's Georgia lawsuit because it told World Harvest there was potentially a problem with coverage in that lawsuit, and GuideOne Elite, its sister company, had sent World Harvest an actual, written reservation of rights in the earlier Illinois Stenger lawsuit. GuideOne Mutual also argues that proving estoppel generally requires a showing of prejudice, and it asserts that general principle applies in this insurance-specific situation. It contends that World Harvest was not harmed by the fact that GuideOne Mutual provided and paid for

_____

[5] After we came to be the Eleventh Circuit, we adopted as binding precedent all decisions of the Fifth Circuit handed down before October 1, 1981. <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

12

the law firm that conducted World Harvest's defense until Guide One Mutual determined there was no coverage. It points out that World Harvest never complained about the law firm it had hired or the quality of representation it was receiving. GuideOne Mutual also argues that there is no evidence that its actions caused World Harvest to suffer a judgment and then settle for $1 million.

## A.

"In this diversity case, we must apply Georgia law." Sales v. State Farm Fire & Cas. Co., 849 F.2d 1383, 1384 (11th Cir. 1988). We first consider whether, under Georgia law, GuideOne Mutual made an effective reservation of its right to deny coverage when it assumed World Harvest's defense in Stenger's Georgia lawsuit. It is undisputed that a GuideOne Mutual claims adjuster told counsel for World Harvest that GuideOne "did not see coverage," but GuideOne Mutual did not provide notification in writing that it was defending World Harvest under a reservation of rights. At oral argument both parties agreed that Georgia law does not necessarily require that a notice of reservation of rights be communicated in

13

writing.[6]  The Georgia Court of Appeals has explained the requirements for a

reservation of rights as follows:

> The general rule of estoppel is limited by the principle that a liability
> insurer may avoid the operation of the rule by giving the insured
> timely notice that, notwithstanding its defense of the action against
> him it has not waived the defenses available to it against the insured.
> Such notice, to be effective, must fairly inform the insured of the
> insurer's position, and must be timely, although delay in giving notice
> will be excused where it is traceable to the insurer's lack of actual or
> constructive knowledge of the available defense.

---

[6] There is one Georgia Court of Appeals decision that specifically refers to the requirement as one of written notification, but that reference is dicta.  Vara v. Essex Ins. Co., 604 S.E.2d 260, 262 (Ga. Ct. App. 2004).  The Vara opinion states that "with full knowledge of the facts, an insurer who assumes and conducts an initial defense without written notification to the insured that such defense is tendered under a reservation of rights by the insurer, is deemed estopped to assert the defense of noncoverage and is deemed to have waived its right to deny liability under the policy." (emphasis added).  Following that statement, the Vara opinion cites another Georgia Court of Appeals decision that does not expressly require notification in writing.  See id. (citing State Farm Mut. Auto. Ins. Co. v. Wright, 224 S.E.2d 796, 798 (Ga. Ct. App. 1976) ("[T]he insurer may avoid the estoppel by informing the insured that, notwithstanding its defense of the action, it disclaims liability and does not waive the defenses available to it against the insured." (emphasis added)).  In Vara the question of whether notification had to be in writing was not presented because it was undisputed in that case that the insurer had given "written notice to [the named insured] that there was no coverage; that [it] would not cover the claims; that it would not provide a defense; and that the attorney had been instructed to abandon the case."  Id. at 261.

We note that the Georgia Court of Appeals has urged insurers to take certain steps after discovering that coverage is in doubt:  "A proper and safe course of action for an insurer in this position is to enter upon a defense under a reservation of rights and then proceed to seek a declaratory judgment in its favor."  Richmond v. Ga. Farm Bureau Mut. Ins. Co., 231 S.E.2d 245, 247 (Ga. Ct. App. 1976).

State Farm Mut. Auto. Ins. Co. v. Anderson, 123 S.E.2d 191, 193 (Ga. Ct. App. 1961) (alteration omitted). As we understand it, Georgia law does not require a reservation of rights to be in writing. See id. Instead, the effectiveness of the notice depends on whether it is timely and "fairly inform[s] the insured of the insurer's position." Id.

Although World Harvest concedes that it did not have to be notified in writing, it contends that the notice it received was ineffective. According to World Harvest, a statement that there are issues about coverage is not enough to reserve the right to deny coverage. GuideOne Mutual argues to the contrary. The district court concluded that "[a]n insured's knowledge of the coverage issue may be a factor in evaluating whether the insured was prejudiced by the insurer's actions, but that knowledge alone does not nullify the estoppel issue." That seems right to us.

It is undisputed that World Harvest knew that there were coverage issues and that GuideOne Mutual did not enter into a reservation of rights agreement with World Harvest, did not send it a reservation of rights letter, and did not explicitly state that to World Harvest that it was reserving its rights. The fact that GuideOne Mutual informed World Harvest that there were "coverage issues" may, however,

15

be relevant to whether World Harvest was prejudiced by GuideOne Mutual's actions.

**B.**

We turn now to the question of whether World Harvest must show prejudice in order to establish that estoppel applies. We have addressed that issue before, but Georgia law may well have changed since then. When we address issues of state law, like the ones in this case, we are bound by the decisions of the state supreme court. See Flintkote Co. v. Dravo Corp., 678 F.2d 942, 945 (11th Cir. 1982). Of course, our prior panel precedent rule still applies even when we are dealing with state law issues. See Venn v. St. Paul Fire & Marine Ins. Co., 99 F.3d 1058, 1066 (11th Cir. 1996). But "[i]f state law changes or is clarified in a way that is inconsistent with the state law premise of one of our earlier decisions, the prior panel precedent rule does not bind us to follow our earlier decision." United States v. Johnson, 528 F.3d 1318, 1320 (11th Cir. 2008); see also Venn, 99 F.3d at 1066 ("[I]f subsequent decisions of the . . . [state] courts cast doubt on our interpretation of state law, a panel would be free to reinterpret state law in light of the new precedents." (quotation marks omitted)). Instead, we follow the latest statement of state law by the state supreme court.

16

We have held that "[i]t is the law of Georgia and the general rule supported by the great weight of authority that if a liability insurer, with knowledge of a ground of forfeiture or noncoverage under the policy, assumes and conducts the defense of an action brought against the insured, without disclaiming liability and giving notice of its reservation of rights, it is thereafter precluded in an action upon the policy from setting up such ground of forfeiture or noncoverage." Riley, 380 F.2d at 156 (quoting State Farm Mut. Auto. Ins. Co, v. Anderson, 123 S.E.2d 191, 193 (Ga. Ct. App. 1961) (alterations and quotation marks omitted)). In the Riley case we said that in such a situation, "prejudice to the insured by the assumption and the conduct of the defense [by the insurer] is conclusively presumed." Id. In the forty-two years since Riley, it appears the law of Georgia is that insurers "may be" subject to estoppel if they defend the insured without a timely and effective reservation of their rights, but it is not as clear as our statement in Riley implies that they always will be estopped from denying coverage in that situation. See Prescott's, 319 S.E.2d at 446; Vara v. Essex Ins. Co., 604 S.E.2d 260, 262 (Ga. Ct. App. 2004); VFH Captive Ins. Co. v. Cielinski, 581 S.E.2d 335, 338 (Ga. Ct. App. 2003); see also Henning v. Cont'l Cas. Co., 254 F.3d 1291, 1295 (11th Cir. 2001).

In 1984 the Georgia Supreme Court decided Prescott's, in which counsel hired by an insurer filed a notice of appearance in a lawsuit against its insured

17

without first issuing a reservation of rights. 319 S.E.2d at 446. Because the insured's personal attorney had already answered the complaint, the counsel hired by the insurer did nothing beyond entering an appearance. Id. The insured made a written demand that counsel hired by the insurer take over as the lead lawyer in defending the insured, but the insurer refused. Id. Three months later, just a few days after the plaintiff in the lawsuit had initiated discovery, the insurer sent a reservation of rights letter to the insured. Id. The insured did not contest the reservation of rights as unjustified or untimely. Id. at 447.

After noting that an insurer may be estopped from asserting a noncoverage defense if it knowingly defends an insured without first issuing a reservation of rights, the Georgia Supreme Court concluded that the insurer was not estopped based on the facts of that case. Id. The Court held that the insurer's "attorney entered only an appearance, and entry of an appearance alone does not create an estoppel." Id. Later the Court added: "Moreover, [the insured] has failed to demonstrate how [the insurer's] participation has prejudiced [the insured's] defense of [the plaintiff's] suit." Id.

While the Court could have rested its decision in Prescott's solely on its determination that "entry of an appearance alone does not create an estoppel," it does not follow that its statement about the insured's failure to show prejudice is

18

merely dicta. The decisional law of Georgia appears to recognize alternative holdings as binding. See, e.g., Grantham v. State, 262 S.E.2d 777, 777 (Ga. 1979) (granting certiorari to review an alternative holding); QOS Networks Ltd. v. Warburg, Pincus & Co., 669 S.E.2d 536, 541 (Ga. Ct. App. 2008) ("A ruling is not dictum merely because the disposition of the case is or might have been made on some other ground. Where a case presents two or more points, any one of which is sufficient to determine the ultimate issue, but the court actually decides all such points, the case is an authoritative precedent as to every point decided, and none of such points can be regarded as having merely the status of a dictum." (citation omitted)); Vann v. Am. Credit Co., 155 S.E.2d 459, 460 (Ga. Ct. App. 1967).

The Georgia Supreme Court's additional or alternative reason for concluding that the insurer in Prescott's was not estopped—the insured had failed to show prejudice—appears to be a binding holding. The apparent holding is that before an insurer can be estopped from using a noncoverage defense in Georgia, the insured must prove prejudice. See generally Prescott's Altama Datsun, Inc. v. Monarch Ins. Co, 317 S.E.2d 845, 848 (Ga. Ct. App. 1984) (noting that "it must be shown that prejudice resulted from the insurer's conduct in defending its action against the insured" and then explaining: "The key word is 'prejudice.' [The insurer's] sole activity prior to the filing of its reservation of rights was the neutral act of filing a

notice of appearance. Thus there was nothing done by [the insurer] that could have prejudiced [the insured's] rights or jeopardized its defense by the release of [the insurer]." (citation and some quotation marks omitted)). If that is a holding of Prescott's, our earlier holding in Riley that prejudice is conclusively presumed must give way. See Johnson, 528 F.3d at 1320; Venn, 99 F.3d at 1066. The result would be that under Georgia law, an insured who wants to estop an insurer from using a noncoverage defense must prove that it was prejudiced by the insurer's participation in the lawsuit against it; prejudice will not be conclusively presumed.

## C.

Anticipating that we might interpret Prescott's to require a showing of actual prejudice, World Harvest argues in the alternative that it has shown that GuideOne Mutual's actions did prejudice it. It argues that GuideOne Mutual's "sudden and wholly unexpected abandonment" of its defense after "eleven months of voluminous discovery and active defense" and "only approximately two weeks before the end of discovery" harmed its ability to defend the lawsuit. Specifically, World Harvest argues that, because of GuideOne Mutual's participation, it did not get to use "counsel of its choice" or to "control its own defense." World Harvest, however, does not point to any evidence that it could not have hired its own counsel or insisted on controlling the defense. Without

20

explaining how, World Harvest concludes that GuideOne Mutual's actions "resulted in a judgment against [it before settlement] of nearly two million dollars."

GuideOne Mutual responds that World Harvest has not proved prejudice because the law firm GuideOne Mutual hired conducted "an extensive amount of discovery" for World Harvest, which never "complain[ed] about the defense being provided" and which "admitted that . . . [World Harvest] would have been content to stay with the defense firm" GuideOne Mutual had selected if only it would have continued to pay that firm. GuideOne Mutual argues that World Harvest's assertion that its actions led to the judgment is "entirely unsubstantiated" because World Harvest has offered no evidence that "had certain actions been taken a judgment would have been avoided or that certain actions by counsel inevitably led to the judgment." GuideOne Mutual also points out that after it withdrew, World Harvest hired the same law firm that had represented World Harvest in the related Illinois action and that one of the lawyers from that law firm had called GuideOne Mutual when the Georgia lawsuit was filed against World Harvest. GuideOne Mutual's position is that any prejudice from its withdrawal was minimal at most.

If we are reading Prescott's correctly to require a showing of prejudice, Georgia law is not clear about what facts or circumstances will satisfy that

21

requirement. No Georgia decision actually holding that an insured has succeeded in showing prejudice has been cited to us, and we have not found any.[7] We have found only a few offering any guidance about what is not enough to show prejudice. See, e.g., Prescott's, 319 S.E.2d at 447; Adams v. Atlanta Cas. Co., 509 S.E.2d 66, 68 (Ga. Ct. App. 1998); Home Indem. Co. v. Godley, 177 S.E.2d 105, 110 (Ga. Ct. App. 1970).

As we discussed earlier, in Prescott's the Georgia Supreme Court held that an insured had not shown prejudice when the attorney hired by the insurer had merely entered an appearance. 319 S.E.2d at 446–47. In that case, the insured's own personal attorney filed an answer to the complaint and the insurer issued a reservation of rights just as discovery was beginning. Id. at 446. The attorney hired by the insurer refused to take over as lead counsel for the insured's defense and, other than entering an appearance, did nothing that could be construed as

_____

[7] We did find one decision in which the Georgia Court of Appeals has concluded that "[o]n the face of it" there was a question of material fact about whether an insurer's actions prejudiced the insured's ability to defend himself in the following circumstances: "By not providing defense counsel after telling [the insured's] personal attorney that it would, [the insurer] could have deprived [the insured] of the opportunity of defending the case against him or settling the case before trial. Instead, [the insurer] rejected settlement offers, and after suit was filed, allowed the case to proceed to a default judgment, without informing [the insured]." Ponse v. Atlanta Cas. Co., 563 S.E.2d 499, 502 (Ga. Ct. App. 2002). Those, however, are not our facts.

22

defending the insured.  Id.  Given those facts, the Georgia Supreme Court stated that the insured had failed to demonstrate how the insurer's participation had prejudiced the defense of the lawsuit.  Id. at 447.  Those, however, are not our facts.

The insurer in Adams, after issuing a reservation of rights, initially told its insured that it had hired and would pay for an attorney to defend him.  509 S.E.2d at 67.  The insurer later "decided not to assume and conduct any defense because [another party's uninsured motorist carrier] was doing so."  Id.  The Georgia Court of Appeals noted that the insurer "did not retain counsel, file pleadings, or conduct a defense on behalf of" the insured and that no evidence had been offered to show how the insurer's participation in the case prejudiced the insured's defense.  Id. at 68.  Those, however, are not our facts.

In Godley, a case that predated Prescott's by fourteen years, the attorney hired by the insurer defended the insured against a Georgia lawsuit for four months but withdrew from representation when the insurer discovered facts that led it to conclude there was no coverage.  177 S.E.2d at 110.  Five months after the withdrawal, an identical lawsuit was filed in Florida.  Id.  A month after that, the Georgia lawsuit was voluntarily dismissed by the plaintiffs.  Id.  The Georgia Court of Appeals held:

23

> There is no estoppel by virtue of the fact that [the insurer's attorney] . . . entered an appearance for the insured in the [Georgia] cases. . . . His action in withdrawing himself and [the insurer] from the defense and turning the defense over to [another insurer's attorney] did not prejudice the rights of [the insured] because some time thereafter these suits were voluntarily dismissed by the plaintiffs. The Florida suits were not filed until five months after the time [the insurer's attorney] withdrew from the case.

Id. Those, however, are not our facts.

From those three decisions, it seems that an insured fails to show that the insurer's participation in its defense prejudiced it if: (1) the insurer never provides an attorney; (2) the attorney hired by the insurer only enters an appearance and does no more; or (3) the lawsuit in which the attorney for the insurer has participated is later dismissed. More than that we do not know. And none of those decisions provides the answer to the question of whether prejudice has been shown in this case.

Fortunately, there is the certification procedure, "a valuable tool for promoting the interests of cooperative federalism," Nielsen, 116 F.3d at 1413. It helps save "time, energy, and resources" and produces "authoritative answers" to "novel or unsettled questions of state law." Arizonans for Official English v. Arizona, 520 U.S. 43, 77, 117 S. Ct. 1055, 1073 (1997). The Georgia Supreme Court has been generous and gracious in answering our certified questions before, and we ask its favor in doing so again.

24

If this case presented only the issues of whether there was a sufficient reservation of rights and whether prejudice must be shown or is presumed, we probably would decide, without asking the Georgia Supreme Court for help, that GuideOne Mutual did not effectively reserve its rights and that Prescott's requires World Harvest to show prejudice. But the issue of what constitutes an adequate showing of prejudice is a state law question on which we do need help. Because the three issues are intertwined, we definitely need help on one of them, and we also recognize the possibility our answers to the other two may be wrong, we think the best course is to certify all three state law questions as a package to the Georgia Supreme Court.[8] We will decide this appeal in accordance with its answers.

We certify the following questions to the Georgia Supreme Court:

> 1) Does an insurer effectively reserve its right to deny coverage if it informs the insured that it does "not see coverage," after the insured had received a written reservation of rights from the insurer's sister company in a similar lawsuit in another jurisdiction, or is a written or more unequivocal reservation of rights required?

---

[8] We recall another case in which we thought we knew the answer to some state law questions and answered them, but we were uncertain about the answers to other questions. See Spain v. Brown & Williamson Tobacco Corp., 230 F.3d 1300, 1312 (11th Cir. 2000). So we certified the state law questions about which we were uncertain and also invited the state supreme court to let us know if we were wrong in our answers to the other ones. Id. It did, and we were. Spain v. Brown & Williamson Tobacco Corp., 363 F.3d 1183, 1195–96 (11th Cir. 2004). The lesson we learned is that if we are going to certify one state law question in a case, it probably is better to go ahead and certify all of them.

2) When an insurer assumes and conducts an initial defense without notifying the insured that it is doing so with a reservation of rights, is the insurer estopped from asserting the defense of noncoverage only if the insured can show prejudice, or is prejudice conclusively presumed?

3) If the insured must show prejudice, do the facts and circumstances of this case show it?

As we have been careful to emphasize before:

> [T]he particular phrasing used in the certified question is not to restrict the Supreme Court's consideration of the problems involved and the issues as the Supreme Court perceives them to be in its analysis of the record certified in this case. This latitude extends to the Supreme Court's restatement of the issue or issues and the manner in which the answers are to be given, whether as a comprehensive whole or in subordinate or even contingent parts.

Martinez v. Rodriquez, 394 F.2d 156, 159 n. 6 (5th Cir. 1968) (citations omitted); accord Essex Ins. Co. v. Zota, 466 F.3d 981, 990 (11th Cir. 2006).

The entire record on appeal in this case, including copies of the parties' briefs, is transmitted along with this certification.

**QUESTIONS CERTIFIED.**