[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 10-14975
Non-Argument Calendar
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 6, 2011
JOHN LEY
CLERK

D.C. Docket No. 7:07-cv-00140-WLS

LARRY SMITH,
GLORIA SMITH,

Plaintiffs - Appellants,

versus

PHILADELPHIA AMERICAN
LIFE INSURANCE COMPANY,

Defendant - Appellee,

CENTRAL STATE HEALTH &
LIFE CO. OF OMAHA,

Defendant.

_____

Appeal from the United States District Court
for the Middle District of Georgia
_____

(July 6, 2011)

Before CARNES, BARKETT and MARCUS, Circuit Judges.

PER CURIAM:

Larry and Gloria Smith appeal from the district court's order granting judgment on partial findings in favor of their insurer, Philadelphia American Life Insurance Company, which the court entered after a bench trial on the Smiths' breach of contract claims against Philadelphia.

## I.

Because this case comes to us after the grant of judgment on partial findings under Federal Rule of Civil Procedure 52(c), the facts are taken from the district court's findings of fact after the court had heard the Smiths' evidence and made decisions concerning the credibility of their witnesses. See Caro-Galvan v. Curtis Richardson, Inc., 993 F.2d 1500, 1504 (11th Cir. 1993).

## A.

In March 2006 Larry Smith of Thomasville, Georgia, was diagnosed with prostate cancer and a local surgeon recommended "radical prostatectomy," or in layman's terms, prostate removal surgery. Concerned about the risks of surgery, the Smiths sought a second opinion from Dr. Gary Onik, an interventional radiologist with an office in Celebration, Florida, a suburb of Orlando. The Smiths scheduled a consultation with Dr. Onik for May 2, 2006. Dr. Onik asked Larry Smith to get MRI imaging completed at a facility in Port Charlotte, Florida,

before the consultation. The Smiths testified that they visited an MRI imaging facility on May 1, 2006 and introduced evidence of a statement they received from a facility in Port Charlotte showing charges for MRI services rendered on that day.

The next day the Smiths attended their scheduled consultation at Dr. Onik's office. Dr. Onik testified that as part of the evaluation process, numerous biopsies of Larry's prostate were taken using a "brachytherapy grid," which mapped the location of each biopsy taken from Larry's prostate. Other than that testimony and the statements showing charges from medical service providers, the Smiths presented no evidence of what Dr. Onik asked the Smiths to do to evaluate Larry Smith's cancer and need for surgery. At the consultation, Dr. Onik recommended that in his opinion, given Larry's particular risks and circumstances, cryoablation would be a better alternative than surgical removal of the prostate.[1]

The Smiths received a statement of charges from Dr. Onik's office, the Center for Surgical Advancement at Florida Hospital Celebration Health, one charge for "Prostate Biopsy (saturation biopsy)" and the other for "Consultation." The Smiths also received several other statements, which showed charges incurred

---

[1] Dr. Onik testified that the cryoablation procedure performed some six months later on Larry Smith involved making a small incision near the prostate gland and inserting several hollow probes into the prostate. Once in place, gases were circulated within the probes causing the probes and any tissue in the vicinity of the probes to freeze at subzero temperatures. The freezing process killed the tumor and a limited amount of tissue surrounding the tumor, which, as dead tissue, was absorbed back into the body.

for services provided to Larry Smith on May 2, 2006. One such statement contained an itemized list of charges incurred from Florida Hospital Celebration Health. That statement listed 19 items, two of which were for a "Needle Biopsy," and a "Grid Brachy-Disp Temp." Other items included medications, tests, instruments, surgery time, anesthesia, and post-operative bed rest time, but none of those items were addressed by any testimony or other evidence presented by the Smiths.

The Smiths also received a statement from JLR Anesthesia for "Biopsy Prostate Needle" at "FH Celebration Main" and a statement of charges from Central Florida Pathology Associates, PA located in Orlando, Florida for services at "Celebration Health." Finally, the Smiths received a statement showing 48 instances of "Level IV Surg Path." done on samples taken "5-02-06" from Bostwick Laboratories, Inc. located in Atlanta, Georgia. There was no indication on that statement about where the samples that were tested by Bostwick were taken. All told, the charges for services performed for Larry Smith on May 1 and May 2, 2006 totaled $21,148.09.

After meeting with Dr. Onik, the Smiths decided on the cryoablation procedure. Dr. Onik informed the Smiths that to prepare for the procedure Larry would need to undergo testing and hormone therapy for six months leading up to

4

the cryoablation procedure.[2]  The testing involved a bone scan, CT, and ultrasound to monitor the size of the prostate during hormone treatment.  Larry Smith had both his initial testing done and began his six months of hormone therapy at a hospital in Tallahassee, Florida, a few weeks after his consultation with Dr. Onik. In October 2006 after the six months of hormone therapy, more tests were performed on Larry Smith at the hospital in Tallahassee.  The Smiths received statements for the initial testing services and the October 2006 services from the Tallahassee hospital, which totaled $9,166.00.

After completion of the hormone therapy Dr. Onik performed the cryoablation procedure on Larry Smith at the hospital in Celebration, Florida.  The Smiths received several statements from various entities indicating charges associated with the cryoablation procedure.  The charges for the services on those statements totaled $71,324.10.

At all times relevant to this case Larry Smith was covered under his wife's supplemental health insurance policy issued by Philadelphia.[3]  The policy was not a major medical expense policy, but a supplemental one that provided coverage

---

[2] Hormone therapy limits the amount of testosterone in the body, which causes the prostate and any cancerous tissue in it to shrink.  The Smiths do not dispute that they were properly compensated under the policy for the hormone therapy.

[3] The policy was actually issued by Central States Health & Life Insurance Co. of Omaha in 2001, but in 2005 Philadelphia assumed all obligations and liabilities under the Smiths' policy.

only for certain, specific costs relating to the diagnosis and treatment of cancer and other specified diseases. Thus, instead of blanket coverage for all costs related to cancer or any other disease, the policy only covered certain costs for certain diseases.

One cost covered by the Smith's policy was a "second surgical opinion benefit." For that, Philadelphia agreed to "pay the actual charges incurred for a second . . . surgical opinion," and the policy defined "second surgical opinion" as "an evaluation of the need for surgery by a second physician."

Another cost covered by the policy was a "surgical benefit." For that, Philadelphia agreed to "pay up to $7,500.00 for actual charges made by a surgeon for surgery in or out of a hospital as outlined in the . . . Surgical Benefits Schedule. For operations not listed, a comparable reasonable benefit will be paid." Cryoablation was not a listed operation in the policy's surgery benefits schedule. One procedure that was listed in the schedule of surgical benefits was "Resection of Prostate, Complete," with a maximum of $1,950 allotted to the procedure.

Another procedure provided for under the policy, but not listed in the surgical benefits schedule, was the "Radiation, Radio-Active Isotopes Therapy, Chemotherapy, or Immunotherapy" benefit. For that radiation benefit, Philadelphia agreed to "pay 50% of the first $50,000 of the actual charges, and

100% of the next $100,000 of the actual charges . . . for the following treatment provided it is used for the purpose of modification or destruction of cancerous tissue: . . . (3) chemical substances and their administration including hormonal therapy." That included "the actual charges for only those chemical substances which modify or destroy cancerous tissue and does not include other drugs or medicines given in conjunction with this treatment." And "the treatment must be administered by a Radiologist."

After Larry Smith's cryoablation procedure, his wife Gloria Smith made two claims under the policy for all charges associated with the consultation with Dr. Onik, the treatment before the procedure, and the procedure itself—one for second opinion benefits and the other for a "comparable reasonable" surgical benefit for the cryoablation procedure. Philadelphia paid both claims in part. Specifically it paid $11,458.00 of the $30,314.09 claimed for second opinion benefits and $2,625.50 of the $71,324.10 claimed for the cryoablation procedure.

### B.

The Smiths filed suit in March 2007 in state court against Philadelphia, seeking damages for breach of the supplemental insurance policy, which Philadelphia removed to federal court. After some issues were resolved on summary judgment, the case proceeded to a two-day bench trial in May 2010. At

7

trial after the close of the Smiths' evidence, Philadelphia moved for judgment on partial findings under Rule 52(c). The district court declined to rule on the motion until the close of all of the evidence. After the close of all of the evidence, Philadelphia again moved for judgment on partial findings, and the district court took Philadelphia's motion under advisement.

On September 29, 2010, the district court entered an order granting Philadelphia's motion for judgment on partial findings. The court entered judgment for Philadelphia the next day from which the Smiths timely appealed. In its order granting judgment on partial findings, the district court held that the Smiths had "failed to prove by a preponderance of the evidence that Defendant breached either (1) the second surgical opinion benefit or (2) the surgical benefit's 'comparable reasonable benefit' clause." The Smiths contend that the district court erred in both of its conclusions. We address each in turn, "deciding questions of law de novo and reviewing the district court's factual findings for clear error." Locke v. Shore, 634 F.3d 1185, 1191 (11th Cir. 2011).

## II.

The Smiths argue that the district court misinterpreted the second opinion benefits provision of the policy by reading into it limiting language that was not there. Specifically, the Smiths argue that the district court erred by interpreting

8

the policy to cover only tests "necessary" for Dr. Onik to render his second opinion where the plain language of the policy included no such limitation. A district court's interpretation of an insurance policy, like its interpretation of any contract, is a question of law we review de novo. Chalfonte Condo. Apartment Ass'n, Inc. v. QBE Ins. Corp., 561 F.3d 1267, 1274 (11th Cir. 2009).

In reaching its conclusion, the district court first rejected Philadelphia's narrow reading, which would have included only the opinion of Dr. Onik (i.e., the charge for his consultation with the Smiths). It concluded that the unambiguous language of the benefit provision covered "both the physician's opinion and the tests necessary for the physician to render that opinion." (emphasis added).

Turning to the question of which charges fit under that interpretation, the district court found that "Dr. Onik was the only witness to testify as to what he required to render his second opinion," and that he "testified at length about biopsies and grid mapping." The district court found:

> Dr. Onik, however, did not provide any testimony as to what was necessary to procure the biopsy and grid mapping. The Court finds that it lacks any evidentiary basis to rule that, for instance, the anesthesia administered to Mr. Smith on May 2, 2006, or the MRI obtained on May 1, 2006, were necessary for Dr. Onik to obtain the biopsy and grid mapping. There was simply no evidence submitted thereon by [the Smiths]. While it would be logical to infer that a patient would wish to be under anesthesia during a biopsy of the prostate, or that said biopsy would occur in a hospital operating room, the Court is constrained to

9

considering the evidence presented at trial, not drawing unsupported inferences. The Court finds that the record is devoid of evidence indicating that all of the charges contained in [the statements submitted by the Smiths] <u>were necessary</u> for Dr. Onik to evaluate Mr. Smith's need for surgery. In short, just because charges were incurred on May 2, 2006 does not mean that the evidence shows that they were among "the actual charges incurred for . . . an evaluation of the need for surgery."

(emphasis added). The court found that the policy covered only the itemized charges in the statements that specifically referenced "biopsy" or "grids," but nothing more. It even found that the itemized charges that were on the same statement as the "biopsy" and "grids" charges, such as medications, tests, instruments, surgery time, anesthesia, and post-operative bed rest time, were not covered under the second opinion benefits provision.

The district court interpreted that provision to cover only the charges that were "necessary" to render Dr. Onik's opinion were covered. The plain language of the second opinion benefits provision of the Smiths' policy, however, does not support such a reading. That provision requires Philadelphia to "pay the actual charges incurred for a second . . . surgical opinion." The policy defined "second surgical opinion" as "an evaluation of the need for surgery by a second physician."

This is a diversity case to which Georgia law applies. See <u>World Harvest Church, Inc. v. Guideone Mut. Ins. Co.</u>, 586 F.3d 950, 956 (11th Cir. 2009). "Under Georgia law, contracts of insurance are interpreted by ordinary rules of

10

contract construction." Boardman Petroleum, Inc. v. Federated Mut. Ins. Co., 498

S.E.2d 492, 494 (Ga. 1998). "Where the terms are clear and unambiguous, and

capable of only one reasonable interpretation, the court is to look to the contract

alone to ascertain the parties' intent." Id. And "[t]erms in an insurance policy are

given their ordinary and common meaning, unless otherwise defined in the

contract." Id.

We agree with the district court to the extent it held that the tests must have

a causal connection to Dr. Onik's opinion. We disagree, however, that the Smiths

must have introduced evidence proving that the tests were "necessary." Instead,

the plain language requires only that the charges be "incurred" for the "evaluation

of the need for surgery." The ordinary and common meaning of "incur" in this

context is "to become liable" for. Random House Webster's Unabridged

Dictionary 969 (1997). Thus any actual charges for any medical services

performed for Larry Smith that the Smiths became liable for as part of Dr. Onik

forming and rendering his opinion for surgery are covered by the policy.

Although the district court has yet to make fact findings under the proper

interpretation of the policy, we note that there is some direct evidence in addition

to strong circumstantial evidence that many of the charges were incurred as part of

the biopsy and grid mapping tests Dr. Onik needed for his evaluation. First, Larry

Smith and Dr. Onik both testified that Dr. Onik asked Larry Smith to get MRI imaging of his prostate before the consultation, and the statement from the MRI imaging facility indicated that imaging services were performed on May 1, 2006—the day before Larry's appointment with Dr. Onik.

Regarding the other charges, almost all of them resulted from services performed on the same day that Larry Smith had biopsies taken and had his consultation with Dr. Onik.[4]  Many of those charges resulted from services performed in the same hospital.[5]  Some of the itemized charges were on the same statement as the "biopsy" and "grid" charges that the district court found were covered, even under the court's more limited interpretation of the policy.

Additionally, the Smiths put forth evidence that they were in Celebration (and Port Charlotte where the MRI occurred) for the purpose of procuring Dr. Onik's second opinion.  No evidence suggests to the contrary that Larry Smith had any other tests or doctor's appointments scheduled in Celebration, a city over 250

---

[4] We agree with the district court's conclusion that the charges for the testing services associated with the hormone therapy done at the Tallahassee hospital were clearly not a part of Dr. Onik forming and rendering his opinion.  Some of the tests were performed in late May 2006 and the others in October 2006, long after Dr. Onik had rendered his opinion.  Additionally, circumstantial evidence indicates the testing was done to track the effectiveness of the hormone therapy in shrinking Larry's prostate.

[5] We also note that the statements from Dr. Onik's office indicate that his office is either a part of or associated with the hospital.

12

miles from the Smiths' hometown of Thomasville, Georgia. The circumstantial evidence thus strongly points to the fact that all of the charges for services performed on May 1 and May 2, 2006, for Larry Smith in Celebration and Port Charlotte were incurred as part of Dr. Onik's evaluation. We also note that one statement of charges does not reference Celebration but does appear to show that the samples tested were taken on May 2, 2006. It also shows that nearly 50 samples of something were tested, which is in line with the numerous biopsies that Dr. Onik testified were required to properly map the prostate with a brachytherapy grid.

The actual fact findings, however, are not for us to make in the first instance. Accordingly, we remand this issue to the district court to make findings and conclusions in light of the proper interpretation of the policy's second opinion benefits provision that we have set forth in this opinion.

### III.

The Smiths also contend that the district court erred in holding that they did not prove by a preponderance of the evidence that Philadelphia had breached the policy by not paying the full amount of the Smiths' claim for the cryoablation procedure. As discussed above, under the policy provision titled "surgical benefits," Philadelphia agreed to:

13

> pay up to $7,500.00 for actual charges made by a surgeon for surgery in or out of a hospital as outlined in the . . . Surgical Benefits Schedule. For operations not listed, a comparable reasonable benefit will be paid.

The cryoablation procedure was not an operation listed in the policy, so the question became what "comparable reasonable benefit" Philadelphia had to pay for that procedure. Before the Smiths brought suit, Philadelphia had paid the Smiths $2,625.50 of the amount they had claimed for the cryoablation procedure, which was the $675.50 more than the maximum amount listed in the surgical benefits schedule for surgical removal of the prostate.

Claiming that the policy required Philadelphia to pay more, the Smiths argued in the district court that "comparable reasonable benefit" was ambiguous and should thus be interpreted under Georgia law against their insurer, Philadelphia. The Smiths argued that "comparable reasonable benefit" should not be read as referring only to the "surgical benefits schedule" and the $7,500.00 cap from the provision's preceding sentence, but as also referring to a "comparable reasonable benefit" found anywhere else in the policy. The district court agreed, and Philadelphia does not contest the court's interpretation of that policy language.

The Smiths also argued that they had interpreted the benefits that the policy provided for "Radiation, Radio-Active Isotopes Therapy, Chemotherapy, or

14

Immunotherapy" to be "comparable" to what should be paid for the cryoablation procedure performed on Larry Smith because both procedures "modif[ied] or destroy[ed] cancerous tissue." And because the language of ambiguous insurance provisions must be interpreted in light of how a layperson would reasonably interpret them and since the Smiths were laypeople, their interpretation that cryoablation was "comparable" to radiation should prevail.

The district court, however, disagreed. While acknowledging that the Smiths provided evidence of a layperson's interpretation of the policy, the court held that they did not provide sufficient evidence to show that their layperson interpretation was reasonable. See Boardman Petroleum, Inc. v. Federated Mut. Ins. Co., 498 S.E.2d 492, 494 (Ga. 1998) ("[I]nsurance contracts are to be read in accordance with the reasonable expectations of the insured where possible." (emphasis added)). The court explained:

> [The Smiths] have provided no evidence showing that [they are] qualified to compare one medical procedure to another. While a layperson's reasonable interpretation of insurance contract terms may be considered reliable, a layperson's comparison of two medical procedures lacks reliability. [The Smiths] failed to present a reliable medical witness who might support the theory that the two medical procedures favorably compare. [The Smiths] have not presented sufficient evidence to reasonably explain why the Amendment Rider's [radiation benefit] can be compared to [Larry] Smith's prostate cryosurgery procedure, in light of Dr. Onik's testimony that the procedure did not involve radiation, radio-active isotopes, chemotherapy, or immunotherapy.

15

The district court found that the evidence the Smiths presented did not prove by a preponderance of the evidence that cryoablation was comparable to radiation. Thus, Philadelphia did not breach its obligation under the policy by refusing to pay benefits for cryoablation comparable to the benefits that the policy provided for radiation.

The Smiths argue that there was evidence from which a factfinder could infer that the two benefits were comparable. They point to various snippets of Dr. Onik's testimony about the three prostate procedures — cryoablation, radiation, and prostate removal — that they argue could "provide enough facts from which the factfinder could draw reasonable inferences and make the comparisons for himself."

That argument, however, ignores the clear error standard with which we review the factual findings of a factfinder, and in the case of a bench trial, that factfinder is the district court. See Locke, 634 F.3d at 1191 (11th Cir. 2011); O'Ferrell v. United States, 253 F.3d 1257, 1265 (11th Cir. 2001) ("A district court's bench trial findings of fact are reviewed to determine whether they are clearly erroneous."). The court found, after weighing the evidence and making credibility determinations, that the Smiths did not "present sufficient evidence to

16

reasonably explain" why the two procedures should be considered comparable. That finding was not clearly erroneous. Other than Mrs. Smith's layperson testimony, which the district court found unreliable for purposes of comparing medical procedures, the Smiths presented no direct evidence comparing cryoablation to radiation. While inferences could be made from circumstantial evidence such as Dr. Onik's testimony about the different prostate procedures, the district court as factfinder was not required to draw those inferences.

## IV.

In sum, while we affirm in all other respects, we vacate the district court's order granting judgment on partial findings and remand this case for the limited purpose of determining in light of this opinion which charges in the statements submitted by the Smiths are covered under the policy's second opinion benefit provision.

**AFFIRMED IN PART, VACATED AND REMANDED IN PART.**